713 F.Supp.2d 1305 (2010)
Bruce PORCELL, an individual, and all others similarly situated, Plaintiffs,
v.
LINCOLN WOOD PRODUCTS, INC., and Does 1 through 10, inclusive, Defendants.
No. CIV-08-0617 MCA/LFG.
United States District Court, D. New Mexico.
March 31, 2010.
*1307 Brian R. Strange, Gretchen Carpenter, Tamina Madsen, Strange & Carpenter, Los Angeles, CA, Karen S. Mendenhall, Albuquerque, NM, for Plaintiffs.
Gordon Davenport, III, Matthew R. Lynch, Michael D. Leffel, Theresa A. Andre, Foley & Lardner, Madison, WI, Terry Farmer, Moses, Dunn, Farmer & Tuthill, Albuquerque, NM, for Defendants.

*1308 MEMORANDUM OPINION AND ORDER

M. CHRISTINA ARMIJO, District Judge.
This case is before the Court upon Plaintiff, Bruce Porcell's (Porcell's), Motion for Class Certification. [Doc. 104]. The Court has considered the parties' written submissions, the evidence offered in support of and in opposition to the instant motion, the applicable law, and is otherwise fully informed in the premises. For the reasons that follow, the Court denies Porcell's Motion for Class Certification.

BACKGROUND
Defendant, Lincoln Wood Products, Inc. ("Lincoln"), is a manufacturer of insulated glass windows. [Doc. 112 at 1][1] Its headquarters are in Merrill, Wisconsin. [Id.] Lincoln sells its windows throughout the United States. [Id.] For purposes of this lawsuit, Lincoln windows can be broadly divided into two types. The first type, which the Court will refer to as "low altitude windows," incorporates two or three panes of glass, each pane separated from the others by a layer of gas, either air or argon. [Doc 51, ¶ 37] At the customer's request argon gas, which is superior to air as insulation, can be substituted for air as part of a package upgrade that includes Low-E glass. [Doc 51, ¶¶ 46, 47] In low altitude windows, the space inside the panes of glass is hermetically sealed so that water vapor cannot diffuse into the space, causing fogging on the inside of the glass, [Doc. 51, ¶¶ 43, 48, 49] and so that optional argon gas will not diffuse out. [Doc. 51, ¶¶ 47, 52] In low altitude windows the air pressure in the space between the panes of glass approximates the atmospheric pressure at the place of manufacture. [Doc. 51, ¶ 43]. Low altitude windows present problems when they are shipped through locations at significantly higher altitudes than the place of manufacture. Because atmospheric pressure generally decreases as altitude increases, the higher relative pressure of the air contained inside low altitude windows will cause the panes of glass to deform when low altitude windows are shipped through or to higher altitudes. [Doc. 51, ¶ 43; Doc. 38-2 at 9] This deformation can cause warping, cracking, distortion, and other damage to the window. [Doc. 51, ¶ 43]
The second type of window, which the Court will refer to as "high altitude windows," also incorporates two or three panes of glass, each pane separated from the others by a layer of gas. [Doc. 51, ¶ 44] Although high altitude windows are sealed against gross infiltration of external moisture, [Doc. 116-6 at 8] high altitude windows are not hermetically sealed like low altitude windows; instead, .0195" diameter [Doc. 104 at 12] stainless steel tubes known as "breather tubes" inserted in the frames of high altitude windows breach the hermetic seal and allow air to pass back and forth, thereby equalizing the pressure of the gas contained within the panes of glass with the ambient atmospheric pressure. [Doc. 51, ¶ 44] Because of these breather tubes, the glass in high altitude windows does not experience the deformation at higher altitudes associated with Lincoln's low altitude windows. [Doc. 51, ¶ 44] A major disadvantage of breather tubes is that they allow water vapor to diffuse into the spaces between the glass panes of high altitude windows, increasing, by comparison to low altitude windows, high altitude windows' susceptibility to fogging, and decreasing, by comparison to low altitude windows, high altitude windows' expected life. [Doc. 51, ¶ 48] A second disadvantage is that breather tubes *1309 preclude the use of argon gas, which must be contained by an air-tight seal. [Doc 51, ¶¶ 47, 48] Once high altitude windows are installed, they appear identical to low altitude windows to a consumer. [Doc. 51, ¶¶ 45-46]
Porcell alleges that the information Lincoln provided in its sales literature did not clearly explain that (1) Lincoln manufactures both low altitude and high altitude windows and (2) customers in the western United States ordering windows would receive high altitude windows exhibiting inferior resistance to the infiltration of moisture and consequent fogging and decreased life. [Doc. 51, ¶ 50] Porcell also claims that he and other members of a subclass purchased Low-E windows in the belief that they were obtaining the superior insulation afforded by argon gas, when in fact, Lincoln's use of breather tubes in high altitude windows precluded the use of argon gas in its Low-E windows. [Doc. 51, ¶ 35] Porcell's complaint organizes his allegations into two counts: breach of express warranties under the law of each of nine states in which class members reside, and violation of the consumer protection statutes of Arizona, California, Colorado, Idaho, Oregon, Nevada, New Mexico, and Washington. [Doc. 51 at 19, 21]. His breach of express warranties claim may be further divided into (a) breach of the written Limited Warranty Insulated Glass ("LWIG") and (b) breach of "other" express warranties created by representations in Lincoln's sales literature.
Porcell seeks certification of the following class:
All persons, proprietorships, corporations, and other business and legal entities in Arizona, California, Colorado, Idaho, Oregon, Montana, Nevada, New Mexico, and Washington whose homes, condominiums, apartment complexes, commercial buildings, and/or other structures contain Lincoln windows and doors that were installed with breathing devices and were purchased in, or after 1992 . . . [.]
This class includes a subclass consisting of
all persons, proprietorships, corporations, and other business and legal entities in Arizona, California, Colorado, Idaho, Oregon, Montana, Nevada, New Mexico, and Washington whose homes, condominiums, apartment complexes, commercial buildings, and/or other structures contain Low E Lincoln windows and doors that were installed with breathing devices and were purchased in 1992 through 2005.
[Doc. 104 at 8-9]

DISCUSSION

A. Standard of Review
A party seeking certification pursuant to Fed.R.Civ.P. 23 for a lawsuit to proceed as a class action must satisfy the four requirements of Rule 23(a), numerosity, commonality, typicality, and adequacy, as well as the requirements of at least one of the three categories of class actions described in Rule 23(b). Shook v. El Paso County, 386 F.3d 963, 968 (10th Cir.2004). "[T]he party seeking to certify a class bears the burden of proving that all the requirements of Rule 23 are met." Id. The district court entertaining a Rule 23 motion to certify a class "must engage in its own `rigorous analysis'" of whether the requirements of Rule 23 are satisfied. Id. (quoting Gen. Tel. Co. of the S.W. v. Falcon, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). The district court must accept as true the substantive allegations of the complaint. Id.

B. Rule 23(a)
1. Numerosity Rule 23(a)(1) asks whether "the class is so numerous that joinder of all members is impracticable." *1310 There is no serious dispute that size of the class meets this requirement. [Doc. 111 at 48] (conceding that numerosity is met). Porcell has come forward with evidence that the class will contain around 9,000 members. [Doc. 104 at 16-17] A proposed class numbering in the thousands will almost certainly satisfy the requirement that joinder be impracticable. 1 Newberg on Class Actions 248 (4th ed.2002). Lincoln argues that despite the size of the proposed class numerosity is not met because "there is no way to feasibly identify all current owners of Lincoln products in the nine states at issue." [Doc. 111 at 49] Lincoln's argument is not persuasive. "[T]he prevailing view is that the plaintiff need not allege the . . . identity of class members. A contrary rule would foreclose class litigation because of the impossibility of identifying all class members at the outset. . . ." Newberg on Class Actions at 233-41 The Court finds that the proposed class satisfies the numerosity requirement of Rule 23(a)(1).
2. Commonality Rule 23(a)(2) asks whether there are "questions of law or fact common to the class." The breach of express warranty (LWIG) claim clearly presents common questions of law or fact: (1) whether the LWIG is susceptible to interpretation as a warranty against seal failure; (2) whether the warranty is breached by the delivery of high altitude windows incorporating breather tubes; and (3) whether the filing a previous law suit constituted adequate notice of other class member's claims, UCC § 2-607(3)(a).[2] The breach of "other" express warranties claim likewise presents common questions of law or fact: (1) whether statements in Lincoln's sales literature and on its website created express warranties, UCC § 2-313(1)(a)(b); (2) whether Lincoln's delivery of high altitude windows rather than low altitude windows constitutes a material breach of these "other" express warranties; and (3) whether the filing of a previous law suit constituted adequate notice of individual class member's claims, UCC § 2-607(3)(a). Porcell's consumer protection statute count likewise presents common questions of law or fact: (1) whether Lincoln made material misrepresentations in describing its high altitude windows to customers in the western United States and (2) whether Lincoln unlawfully failed to disclose the presence of breather tubes to class members. In view of these common questions of fact or law, the proposed class satisfies the commonality requirement of Rule 23(a)(2).
3. Typicality Rule 23(a)(3) asks whether "the claims . . . of the representative parties are typical of the claims . . . of the class." Lincoln argues that Porcell cannot meet the typicality requirement of Rule 23(a)(3) because "[his] individual claims "involve circumstances different than those involved in the claims of other class members" and subject Porcell to "unique factual defenses." [Doc. 111 at 50-51] The different circumstances and factual defenses listed by Lincoln are not sufficient to take his case outside the principle that "differing fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class member are based on the same legal or remedial theory." Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988). Here, Porcell's claims are based on the same general legal theories as the class: breach of express warranties and violation of consumer protection statutes, and are based on the same practice of incorporating breather tubes in high altitude windows. Porcell clearly shares the class' interest in recovery of money damages. The Court finds that Porcell's claims are typical of the claims of the class.
*1311 4. Adequacy Rule 23(a)(4) asks if the representative "will fairly and adequately protect the interests of the class." "The purpose of this requirement is to protect the legal rights of absent class members. First, the representatives must not possess interests which are antagonistic to the interests of the class. Second, the representative's counsel must be qualified, experienced, and generally able to conduct the litigation." 1 Newberg on Class Actions at 408. Lincoln argues that "Porcell is an inadequate class representative because his own individual claims suffer from fatal legal defects that render them invalid as a matter of law." [Doc. 111 at 51] This argument ignores the established principle that certification does not depend on the merits of the representative's claims. Vallario v. Vandehey, 554 F.3d 1259, 1267 (10th Cir.2009). If Porcell's own claims are dismissed, that circumstance would not require dismissal of the lawsuit. Adamson, 855 F.2d at 676 (suggesting "intervention by other members of the proposed class or the addition of a named plaintiff who would satisfy the requirement of typicality and adequacy of representations" as alternatives to dismissing a class action upon the dismissal of the original named plaintiff's claims). As previously noted, Porcell's claims are based on the same general legal theories and facts as the class' claims and he shares the class' interest in recovery of money damages. The Court finds that Porcell's interests are not antagonistic to those of the class. The Court has examined the affidavits of counsel for the proposed class, [Doc. 104-11 and 104-12] and is satisfied that Porcell's counsel of record are experienced in class action litigation and are otherwise capable of competent representation of the class. The Court finds that Porcell and his counsel of record will fairly and adequately protect the interests of the class.

C. Rule 23(b)(3)

1. Predominance

a. General Rule 23(b)(3) Standards
As previously noted, a class must satisfy the requirements of at least one of the three categories of class action described in Rule 23(b). Porcell seeks certification pursuant to Rule 23(b)(3). Rule 23(b)(3) requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R Civ. P. 23(b)(3) (emphasis added). "The predominance requirement is similar to, but `far more demanding' than the commonality requirement of Rule 23(a)." Mulford v. Altria Group, Inc., 242 F.R.D. 615, 625 (D.N.M.2007) (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623-24, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). "The nature of the evidence that will suffice to resolve a question determines whether the question is common or individual. If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question." Id.

b. Predominance and Choice of Law
In a proposed multi-state class action, choice of law analysis is interwoven with the certifying court's Rule 23(b)(3) predominance determination. 7AA Charles Alan Wright, Arthur Miller and Mary Kay Kane, Federal Practice and Procedure § 1780.1 (3d ed.2005).
A district court exercising diversity jurisdiction applies the choice of law rules of the forum state. Fed. Ins. Co. v. Tri-State Ins. Co., 157 F.3d 800, 802 (10th *1312 Cir.1998). The New Mexico Supreme Court recently adopted special choice of law rules for multi-state class actions. Ferrell v. Allstate Ins. Co., 144 N.M. 405, 188 P.3d 1156 (2008). Under Ferrell, a New Mexico court will apply New Mexico law if (1) application of forum law is constitutional or (2) if New Mexico choice of law rules lead to the selection of New Mexico law. Id. at 413, 188 P.3d 1156. Conflicts between New Mexico law and potentially applicable foreign law are to be resolved according to the choice of law principles of the Restatement (Second) Conflict of Laws (1971), id. at 422, 188 P.3d 1156, at least in multi-state contract class actions.[3] Here, Porcell has not even acknowledged the basic principle that this Court must apply New Mexico choice of law rules. There is absolutely no discussion of choice of law rules in Porcell's briefs. Instead, Porcell simply assumes throughout his Motion for Class Certification that the law of the state where the class member resides will govern a class member's claims. Lincoln, relying on Porcell's apparent concession that the law of the state where the class member resides will govern a class member's claim, includes only a brief discussion of choice of law. [Doc. 111 at 32 n. 9 (quoting Woodard v. Fid. Nat'l Title Ins. Co., No. Civ. 06-1170 RB/WDS, 2008 WL 5737364 (D.N.M. Dec. 8, 2008))] Since application of individual state's substantive law would have the advantage of minimizing possible constitutional concerns raised by the uniform application of forum substantive law to the claims of out-of-state class members, see Woodard, 2008 WL 5737364 at *4 (observing that "simply applying New Mexico's substantive law to all claims [in a five-state class action] would violate the Due Process Clause and the Full Faith and Credit Clause"), and is most probably the result that would obtain under New Mexico choice of law rules, id. at *5, the Court will defer to the parties' choice-of-law-by-default. "The burden of proof lies with the plaintiffs; in not presenting a sufficient choice of law analysis they have failed to meet their burden of showing that common questions of law predominate." Spence v. Glock, 227 F.3d 308, 313 (5th Cir.2000). Accordingly, for purposes of the present motion, the substantive law of the state where a class member resides will govern that class member's claims.

c. Breach of the LWIG

(i) Elements
The LWIG exists in two variants, a ten-year, pre-July 1996 warranty and a lifetime, post-July 1996 warranty.[4] [Doc. 112-2 at 2-3] The operative provisions of the two variants are set out below:
Pre-July 1996
Lincoln Wood Products, Inc., extends a limited warranty on it's [sic] insulating glass for a period of ten (10) years from date of manufacture, to the original consumer for failure of the seal causing impaired vision due to moisture, film, or dust between glass. . . .
. . . .

*1313 If a unit fails to conform to it's [sic] warranty, Lincoln Wood Products, Inc., will furnish a replacement glass to the original consumer without charge; the warranty on the replacement will extend for the remainder of the warranty period for the original unit.
. . . .
. . . . This warranty does not cover labor or other costs associated with the installation or removal of this product for repair or replacement. . . . There are no warranties granted other than as expressly provided.
Post-July 1996
Effective July 1, 1996, Lincoln Wood Products, Inc., extends a limited warranty on insulated glass for the life of the product for seal failure causing impaired vision due to moisture, film, or dust between glass. . . .
. . . .
For seal failures, Lincoln will furnish replacement glass at no charge for a period of ten (10) years from the date of manufacture. After 10 years Lincoln will furnish replacement glass at 50% of the published list price at time of replacement.
. . . .
. . . . This limited warranty does not cover labor, shipping expenses or other costs associated with the installation or removal of product for repair or replacement. . . . There are no warranties granted other than as expressly provided.
[Doc. 112-2 at 2-3]
The elements of a claim for breach of warranty are: "the existence of a warranty, the breach thereof, causation, and damages." Camino Real Mobile Home Park Partnership v. Wolfe, 119 N.M. 436, 442, 891 P.2d 1190 (1995). The Court concludes that the first element, the existence of a warranty, will be capable of common proof, provided the class is divided into two subclasses, a pre-July 1, 1996 subclass, and a post-July 1, 1996 subclass.
As to the second element, breach, the Court understands Porcell to be arguing for purposes of class certification that the LWIG is a warranty against seal failure, which necessarily is breached by the delivery of windows incorporating breather tubes. [Doc. 104 at 32] To the extent the element of breach turns upon the interpretation of standardized contract language contained in the LWIG, it will be susceptible to class-wide proof under the prevailing objective theory of contracts, which looks to the expectations of "hypothetical reasonable contracting parties." Farmington Police Officers Ass'n v. City of Farmington, 139 N.M. 750, 757-58, 137 P.3d 1204 (Ct.App.2006) (discussing objective theory of contractual assent). To the extent that breach turns upon the factual question of the presence of breather tubes in class members' windows, Lincoln itself concedes that "[i]nsulated glass products sold by Lincoln to dealers located in or west of the Rocky Mountains contain capillary[5] tubes." [Doc. 111 at 12]. Since the nine states in which class members reside are in or west of the Rocky Mountains, the Court finds that the factual component of the element of breachwhether class members' windows contain breather tubeswill be susceptible to class-wide proof.
The third element of a claim for breach of warranty is causation. The extent to which causation will be in issue depends upon the measure of damages that the class seeks at trial:
When plaintiffs claim only general damages based on the market-contract differential, they are almost never required *1314 to prove that the breach was a but-for cause of actual loss. When plaintiffs claim consequential damages, however, they are ordinarily required to prove that breach in fact caused the loss they claim.
3 Dan B. Dobbs, Law of Remedies 65 (2d ed.1993). In his Motion for Class Certification, Porcell asserts that:
Essentially, the only individual issue that will exist is the issue of damages, but Plaintiff expects damages to be calculated on a classwide basis with expert consultation. Damages will be determined in the same manner for each class member on the basis of Lincoln's and its dealers' records regarding how much end-users paid for the products. Expert testimony, such as the declaration of Robin Booth, which states that breathing devices will decrease the product lifespan by approximately 4 to 6 times, will provide a classwide method for determining damages. . . .
[Doc. 104 at 21 (Emphasis added)]. Porcell's Reply Brief in Support of Motion for Class Certification [Doc 121], contains the following discussion of damages:
First, individualized damages determinations are not necessary here because damages can be proven on a classwide basis, a "particularly significant management tool" available to the Court. 2 Newberg § 4:33 at 293. Plaintiff will prove that all class members have been damaged by their purchase of Lincoln products that are defective due to the installation of breathing devices (regardless of whether their windows have failed). Contrary to Lincoln's claim that some class members will not be able to prove any loss, damages will be proven on a classwide basis based on the average deceased life expectancy as a result of the breathing devices. So too with the Low E subclass: damages can be proven on a classwide basis based on the average loss in energy efficiency due to the lack of argon in the Lincoln product.
[Doc. 121 at 20-21 (footnote omitted; original emphasis omitted and emphasis added)]. The Court discerns three types of damages arguably claimed by Porcell: (1) damages measured by the price class members paid for their windows; (2) damages measured by the difference in value between low altitude windows and high altitude windows based on the decreased life span of high altitude windows by comparison to low altitude windows; and (3) damages for increased costs of heating and cooling resulting from the inferior insulating quality of high altitude Low-E windows. The first and second types of damages are types of general damages. Camino Real Mobile Home Park Partnership, 119 N.M. at 442-43, 891 P.2d 1190. Causation will not be an issue with these damages. The third type of damages is a form of consequential damages limited to the Low-E subclass. See UCC § 2-715(2)(a)(defining consequential damages to include "any loss resulting from general.. . requirements and needs of which the seller at the time of contracting and which could not reasonably be prevented by cover or otherwise"). There can be no serious dispute that windows filled with air exhibit inferior insulating characteristics by comparison with windows filled with argon gas, [Doc. 104-2 at 10] and that the insulating characteristics of a window relate to energy efficiency, and consequently to the purchaser's costs of heating and cooling. [Doc. 104-2 at 9-10; Doc. 104-3 at 3] To the extent that causation is an issue with respect to the third type of damages, the Court finds that it will be susceptible to common proof applicable to the entire Low-E subclass.
The fourth, and final, element of a claim for breach of warranty is damages. As the Court has previously noted in connection *1315 with causation, Porcell's memoranda identify three types of damages.
The first type, the class member's cost of purchase, will by its very definition depend upon individualized proof as to the number, size, and type (Low-E versus standard glazing) of windows owned by the class member.
The second type, diminution-in-value damages, is not susceptible to class-wide proof on the record now before the Court. In his motion for certification, Porcell attempts to side-step questions of individual proof based on a statement by his expert witness, Robin Booth, that the life span of high altitude windows is "roughly 4 to 6 times shorter" than the life span of comparable low altitude windows. [Doc. 104 at 13]. Booth's reference to the figure "4 to 6 times shorter," clearly derives from a report of a laboratory experiment that Booth conducted in 1985. [Doc. 38-2] In that experiment, windows with breather tubes were subjected to high (95%) relative humidity coupled with severe thermal cycling (117°F differential per cycle, 228 cycles over a 38 day period). [Doc. 38-2 at 11] In the report of his experiment Booth concluded that windows with leave open breather tubes "exhibit 4 to 6 times more moisture gain than units without breather tubes," [Doc. 38-2 at 17], but crucially, these results were obtained under artificially accelerated weathering conditions that cannot reasonably be expected to occur throughout the nine states in which proposed class members' windows are installed. [Doc. 38-2 at 19 (observing that "[i]t is important to note that our work was largely based on accelerated weathering testing"); Doc. 116-6 at 18 (conceding that what happens under artificial laboratory testing is "not exactly what happens" in the field)]. More to the point of the present Rule 23(b)(3) predominance inquiry is a predictive model that Booth developed in conjunction with his accelerated weathering study to estimate the life span in the field of windows with leave-open breather tubes. [Doc. 38-2 at 27-35; Doc. 38-3 at 6-10] According to Booth, windows with breather tubes unquestionably will have a shorter life before the onset of fogging by comparison to window without breather tubes. [Doc. 104-13 at 2] However, also according Booth, exactly how much shorter the life span will be in a real world setting will vary significantly depending on the climate at the place of installation, whether the window is installed in a sunny or shady location, the dimensions of the window, and the amount of desiccant used by the manufacturer to counteract moisture intake. [Doc. 38-3 at 6-7; Doc. 116-6 at 19] Indeed, at his deposition Booth would not give an opinion as to the expected life span of an insulated glass unit "[b]ecause there are too many factors involved." [Doc. 116-6 at 12-13] The Court concludes that when Booth's study, his deposition testimony, and the opinions in his declaration and expert report are examined critically, the best case fairly supported by the record now before the Court is that high altitude windows have a shorter life span than low altitude windows, but exactly how much shorter will vary significantly from installation to installation. [Doc. 38-3 at 8-9] This evidence will not suffice to establish a class-wide diminution in value. Class members will have to rely on individualized proof that takes into account the various factors identified by Booth to establish by what amount the life spans of their respective windows are decreased by comparison with a comparable low altitude window.
The third type of damages, increased costs of heating and cooling, also is not susceptible to class-wide proof on the record now before the Court. Porcell assumes that damages can be proven the based on "the average loss in energy efficiency due to the lack of argon in the *1316 Lincoln product" However, Porcell has not described a statistical model by which such an average could be computed, nor has he identified an expert witness who is prepared to establish the reliability of such a statistical model. Consequently, the Court has no way of determining whether Porcell's proposed "average loss in energy efficiency" model would even approximate Lincoln's actual liability to individual class members, raising concerns of fairness to Lincoln as well as to class members whose actual damages exceed the average. Pure speculation that class-wide proof of damages may be possible does not satisfy Porcell's of proving that common issues of fact will predominate over individual issues. Mulford, 242 F.R.D. at 626-27 (citing Pearson v. Philip Morris, Inc., No. 0211-11819, 2006 WL 663004 (Or.Cir. Feb. 23, 2006) (observing that a certifying court "must have evidence, and not merely the representations of counsel, that a type of proof is available")).
The Court finds that Porcell has not established that common issues of fact will predominate over individual issues of fact with respect to the amount of damages each class member has suffered as the result of Lincoln's alleged breach of the LWIG.

(ii) Notice
UCC § 2-607(3)(a) provides that "the buyer must within a reasonable time after [buyer] discovers or should have discovered any breach notify the seller of the breach or be barred from any remedy[.]" Porcell argues that the requisite notice was provided by his filing of a previous proposed class action in federal court in Wisconsin, [Doc. 121 at 31] which Porcell voluntarily dismissed before it reached the class certification stage. Whether the filing of a lawsuit that was never certified as a class action can constitute sufficient individual notice under § UCC 2-607(3)(a) for each proposed and, with the exception of Porcell, as yet unidentified class member clearly presents an unsettled question of law. Even if the Court assumes that the filing of the earlier proposed class action in Wisconsin federal court constituted legally sufficient actual notice excusing individual notice by each proposed class member, that notice would be timely only if the event if by which a class member "discovers or should have discovered" the breach occurred sufficiently close to the filing of the Wisconsin complaint to permit the Wisconsin complaint to serve as notice "within a reasonable time after he discovers or should have discovered any breach." Thus, even under Porcell's dubious legal theory that Lincoln received adequate § 2-607(3)(a) notice from each member of the proposed nationwide class upon the filing of the Wisconsin complaint, there still will be a need for individual determinations of when each proposed class member discovered or should have discovered the breach of the LWIG. If Porcell's class-wide notice theory fails under the law of one or more jurisdictions, which the Court has reason to believe it will, class members residing in those jurisdictions will have to prove that they gave individual notice complying with UCC § 2-607(3)(a). See Drobnak v. Andersen Corp., 561 F.3d 778, 785-86 (8th Cir.2009). The Court concludes that the issue of UCC § 2-607(3)(a) notice presents a question in which individual questions of fact will predominate.

(iii) Statute of Limitations
"A federal court hearing a diversity action applies the statute of limitations which would be applied by a court of the forum state." Dow Chem. Corp. v. Weevil-Cide Co., Inc., 897 F.2d 481, 483-84 (10th Cir.1990). Under New Mexico choice of law principles, a statute of limitations is procedural, and therefore applies even where the applicable substantive law is that of another state. Nez v. Forney, *1317 109 N.M. 161, 162, 783 P.2d 471 (1989). UCC § 2-725(1), codified in New Mexico at NMSA 1978, § 55-2-725(1), provides that "[a]n action for breach of any contract for sale must be commenced within four years after the cause of action has accrued." NMSA 1978, § 55-2-725(2) sets out the applicable accrual rules:
A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance, the cause of action accrues when the breach is or should have been discovered.
The complaint in Wisconsin federal court was filed on December 28, 2007, [Porcell v. Lincoln Wood Products, Inc., No. 07-cv-729-bbc (W.D.Wis.) [Doc. 1]] and was voluntarily dismissed on May 13, 2008. [Porcell v. Lincoln Wood Products, Inc., No. 07-cv-729-bbc (W.D.Wis.) [Doc. 25]] Porcell filed a complaint in New Mexico district court on June 2, 2008, which Lincoln removed to this Court on July 7, 2008. NMSA 1978, § 37-1-14, provides that "[i]f, after the commencement of an action, the plaintiff fail therein for any cause, except negligence in its prosecution, and a new suit be commenced within six months thereafter, the second suit shall, for purposes herein contemplated, be deemed a continuation of the first." The Court will assume hat this removed action constitutes a continuation of the Wisconsin federal suit for purposes of § 37-1-14, and therefore that the relevant cut-off date for statute of limitations purposes is four years prior to December 28, 2007, the date that Porcell filed his complaint in Wisconsin federal court.
In his Motion for Class Certification, Porcell argues that the LWIG is a warranty against seal failures that "is breached by Lincoln's installation of breathing devices, which constitutes a seal failure for which Lincoln is unwilling to provide non-defective warranty replacements." [Doc. 104 at 32] Under this interpretation of the LWIG, the breach of the LWIG would have occurred upon tender of delivery of high altitude windows incorporating breather tubes, and in the case of the Low-E subclass, lacking argon gas. It is immediately apparent that those class members whose windows were delivered prior to December 28, 2003 face a substantial statute of limitations problem, since the four-year statute of limitations began to run upon tender of delivery, "regardless of the aggrieved party's lack of knowledge of the breach."
In his response to Lincoln's Rule 12(b)(6) motion to dismiss, Porcell argued that Lincoln should be equitably estopped from asserting the statute of limitations based on the theory that Lincoln's local New Mexico dealer was Lincoln's agent, that the local dealer made false representations to him and concealed information from him, and that in reasonable reliance on these representations and omissions he refrained from pursuing legal action against Lincoln. [Doc. 80 at 19-20] UCC § 2-725(4) provides that "this section does not alter the law on tolling of the statute of limitations." The Court finds that to the extent that class members intend to rely on equitable estoppel to trump the four-year statute of limitations of § 55-2-725(1), determining whether their claims for breach of the LWIG are time-barred will require individualized fact finding as to the elements of equitable estoppel. [Doc. 80 at 28 n. 11 (asserting that "whether or not Lincoln induced Porcell to refrain from filing suit involves a series of factual inquiries")]

*1318 d. Breach of "Other" Express Warranties
As the Court understands this claim, Porcell alleges that Lincoln's catalogs, brochures and website contained information about Lincoln windows that amounted to express warranties that the class members' windows would be identical to Lincoln's low altitude windows in construction and performance, and that these "other" express warranties were breached by Lincoln's delivery of high altitude windows incorporating breather tubes, and in the case of Low-E windows, lacking argon. As previously noted in connection with Porcell's claim for breach of the LWIG, the elements of a claim for breach of warranty are: "the existence of a warranty, the breach thereof, causation, and damages." Camino Real Mobile Home Park Partnership, 119 N.M. at 442, 891 P.2d 1190.
The first element, existence of a warranty, is governed by UCC § 2-313, which provides:
(1) Express warranties by the seller are created as follows:
(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
. . . .
Statements in sales literature unquestionably can create express warranties. 1 White & Summers, Uniform Commercial Code 622-24 (5th ed.2006). However, it is well established that representations in sales literature of which a purchaser was unaware cannot become part of the "basis of the bargain" between the seller and the buyer. White & Summers, supra, at 623-24. Therefore, proof that a statement was made in a Lincoln catalog or brochure or on its website must at a minimum be coupled with proof that a particular class member saw the statement in order for it to become part of the basis of that class member's bargain with Lincoln. Id.
What a buyer must prove over and above the fact that he or she was aware of a representation in order for the representation to give rise to an express warranty varies among the nine jurisdictions within which class members reside. Porcell concedes that in Arizona and Washington, the plaintiff must have relied on a representation in order for it to give rise to an express warranty. [Doc. 121 at 30]. In California, a representation made by the seller to the buyer concerning the character of the seller's goods is presumptively part of the basis of the bargain, subject to the proof by the seller that the representation was not a factor inducing the buyer to enter into the bargain. Keith v. Buchanan, 173 Cal.App.3d 13, 220 Cal. Rptr. 392, 397 (Cal.Dist.Ct.App.1985). Under Colorado law, evidence that a buyer relied on the seller's representations and that the representations "formed an essential part of [plaintiff's] decision" to use the seller's product is sufficient to establish that the seller's representations gave rise to an express warranties. Palmer v. A.H. Robins Co., Inc., 684 P.2d 187, 208 (Colo. 1984). Under Idaho law, there is no independent requirement of reliance and an affirmation of fact is presumed to become part of the basis of the bargain, subject to clear proof of circumstances taking the affirmation out of the agreement. Jensen v. Seigel Mobile Homes Group, 105 Idaho 189, 668 P.2d 65, 71 (1983). Nevada does not require actual reliance in order for a representation to become an express warranty, but the representation must be part *1319 of the basis of the bargain; proof that the "resulting bargain did not rest at all on the representations of the seller" will preclude the representations from giving rise to an express warranty. Allied Fidelity Ins. Co. v. Pico, 99 Nev. 15, 656 P.2d 849 (1983). New Mexico law does not impose "an independent `reliance' requirement," but it does require evidence that the representation entered into the buyer's decision to purchase the defendant's product, and evidence that the representation did not enter into the buyer's decision will defeat a claim that a representation gave rise to an express warranty. Perfetti v. McGhan Medical, 99 N.M. 645, 651, 652, 662 P.2d 646 (Ct.App.1983). Oregon requires proof that a representation was part of the basis of the bargain in order for the representation to constitute an express warranty, Autzen v. John C. Taylor Lumber Sales, Inc., 280 Or. 783, 572 P.2d 1322 (1977), but it is unclear what standards Oregon courts use to determine that a representation becomes part of the basis of the bargain. The parties have not cited, and the Court could not find, a Montana case directly on point. Further, based on Official Comment 3 to UCC § 2-313, it appears likely that in every jurisdiction in which the class members reside, Lincoln will be entitled to show by "clear affirmative proof" that representations in its sales literature or on its website did not become part of the basis of an individual class member's bargain, even if the class member was aware of such information.
The Court finds that with respect to the question of whether "other" warranties were created by Lincoln's sales literature, individual questions of (1) what specific information was provided to a class member and (2) whether that information became part of the basis of the class member's bargain will predominate over issues of fact common to the class. The second prong will be significantly complicated by differences in case law interpreting UCC § 2-313 among the various states in which class members reside.
The Court will not separately address the remaining three elements of Porcell's claim for breach of "other" express warranties as these elements will present problems of proof similar to the problems previously addressed by the Court in the context of Porcell's claim for breach of the LWIG.
The Court likewise will not restate its analysis of UCC § 2-607(3)(a) notice and UCC § 2-725 statute of limitations issues as these defenses will present problems of proof similar to the problems previously addressed by the Court in the context of Porcell's claim for breach of the LWIG.

e. Violations of Unfair Trade Practices/Consumer Protection Statutes
As the Court understands this claim, Porcell intends to establish an unfair or deceptive trade practice or violation of a consumer protection statute under the laws of eight of the states in which class members reside based on the theory that Lincoln's catalogs, brochures and website represented to potential purchasers that all Lincoln windows are hermetically sealed and that all Lincoln Low-E windows are filled with argon gas and have the better insulating characteristics associated with argon gas, [Doc. 104 at 8, 10-11] when in fact all Lincoln windows sold to purchasers in the states in which the class members reside are high altitude windows manufactured with breather tubes that breach the hermetic seal and that preclude the use of argon gas in Low-E windows. [Doc. 104 at 12-14] As an alternative to his claim based on affirmative misrepresentations in Lincoln's sales literature, Porcell intends to prove that Lincoln's failure to disclose the incorporation of breather tubes into high altitude windows resulting *1320 in a shorter life span and inability to retain argon gas constituted an unfair and deceptive practice. [Doc. 104 at 8, 9; Doc. 121 at 10, 12]
The Court will begin its analysis by applying Rule 23(b)(3) to the New Mexico Unfair Practices Act, NMSA 1978, § 57-12-1 et seq. (the "NMUPA"), the consumer protection statute with which the Court is most familiar. The NMUPA defines an "unfair or deceptive trade practice" as "any false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services . . . by any person in the regular course of his trade or commerce, which may, tends to or does deceive or mislead any person. . . ." NMSA 1978, § 57-12-2(D). Subsection 57-12-2(D) contains a non-exclusive list of seventeen types of conduct that constitute an unfair or deceptive trade practice. Porcell's theory of his case arguably fits within the catch-all definition quoted above as well as paragraphs (5), (7), (14) and (17) of § 57-12-2(D). Section 57-12-10(B) provides that "[a]ny person who suffers any loss of money . . . as a result of any employment by another person of a method, act or practice declared unlawful by the Unfair Practices Act may bring an action to recover actual damages or the sum of one hundred dollars ($100), which ever is greater." In a class action, class members are limited to recovery of "actual damages as were suffered by each member of the class as a result of the unlawful method, act or practice." NMSA 1978, § 57-12-10(E).

(i) Reliance/Causation
Lincoln argues that Porcell's claim based on violations of unfair practices acts or consumer protection statutes is not maintainable as a class action because individual questions of fact involving reliance or causation will predominate over common questions of fact. [Doc. 111 at 34-36] Lincoln's argument requires the Court to determine what reliance or causation requirement the NMUPA imposes. The phrase "as a result of" suggests that the New Mexico Legislature had in mind traditional causation principles when it enacted § 57-12-10(B). See Pearson v. Philip Morris, Inc., 2006 WL 663004 at *4 (concluding that the plain meaning of the words "as a result of" in Oregon Unlawful Trade Practices Act imposes a causation requirement); see also Selgado v. Commercial Warehouse Co., 86 N.M. 633, 636, 526 P.2d 430 (Ct.App.1974) (using "as a result of" as synonymous with proximate cause). Reliance is the traditional causal mechanism of fraud. Restatement (Second) Torts § 546 (1977). The New Mexico Court of Appeals has held that for purposes of the NMUPA proof of actual damages or proximate cause does not necessarily require proof of traditional detrimental reliance. Smoot v. Physicians Life Ins. Co., 135 N.M. 265, 270, 87 P.3d 545 (Ct. App.2003). However, there still must be a causal "nexus" between the defendant's deceptive conduct and the plaintiff's loss. Id. In the context of claims based on false advertising directly communicated to the plaintiff and where the plaintiff seeks damages measured by the purchase price paid for a defective product or the difference in value between the product as represented and the product as delivered, reliance would appear to be equivalent to the cause-in-fact of the plaintiff's damages, since it is the plaintiff's decision to buy the product that causes the plaintiff's loss. See id. (observing that "reliance concerns the nexus between a defendant's conduct and a plaintiff's purchase . . ."). In other words, once the plaintiff has paid for the defective product in reliance on the defendant's misrepresentation, no further causal links are necessary to establish loss measured by the purchase price or the difference *1321 in value between the product as represented and the product as delivered. Under the circumstances of this case, and in view of Porcell's theory of the case and the measures of damages requested, an individual class member will have to demonstrate something akin to traditional reliance[6] to establish the requisite "causal nexus" between the particular misrepresentations communicated to a class member and the class member's loss. Even if the Court were to apply an objective standard of reliancewhether the representations would have mattered to a hypothetical reasonable class memberPorcell and the class must still prove what representations a particular class member read or saw in order to establish the requisite causal link between the misrepresentations and the class member's loss. Because there is no basis in the record for determining which versions of Lincoln's catalogs, brochures or website a particular class member read or saw, the "causal nexus" element of a NMUPA claim will not be susceptible to class-wide proof.
As previously noted, the Court has ruled that for purposes of the present motion, the substantive law of the state where a class member resides will govern his claims. Under Arizona's consumer fraud statute, the plaintiff must show actual reliance, but the reliance need not be reasonable. Parks v. Macro-Dynamics, Inc., 121 Ariz. 517, 591 P.2d 1005, 1008 (Ariz.Ct. App.1979). Under case law interpreting California's Unfair Competition Law, there are different standards for the class representative and the class members: only the class representative must show actual reliance, In re Tobacco II Cases, 46 Cal.4th 298, 93 Cal.Rptr.3d 559, 207 P.3d 20, 38 (2009), and class members may obtain relief "without individualized proof of deception, reliance and injury," id. at 35. Under case law interpreting the Colorado Consumer Protection Act, plaintiffs must show causation, which may require proof of reliance depending on the context. Crowe v. Tull, Azar & Assoc., 126 P.3d 196, 209-211 (2006). Idaho's Consumer Protection Act permits any person who has "suffered any ascertainable loss of money . . . as a result of the use or employment" of an unlawful practice to "bring an action to recover actual damages." Idaho Code Ann. § 48-608 (2008). The Court could find no reported case interpreting the phrase "as a result of" in § 48-608. Under case law interpreting the Oregon Unlawful Trade Practices Act, reliance is required where the plaintiff alleges that he or she acted on the seller's express representations, but may not be required in all contexts. Feitler v. Animation Celection, Inc., 170 Or. App. 702, 13 P.3d 1044, 1047 (Ore.Ct.App. 2000). The Nevada Deceptive Trade Practices Act permits "a victim of consumer fraud" to bring an action to recover "damages that he has sustained." Nev.Rev. Stat. Ann. § 41.600 (2007). The United States District Court for the District of Nevada has predicted that the Nevada Supreme Court will construe § 41.600 to require reliance in cases of affirmative misrepresentation. Picus v. Wal-Mart *1322 Stores, Inc., 256 F.R.D. 651, 657-58 (D.Nev.2009). Under the Washington Consumer Protection Act, individual claimants must show causation, which, depending on the claimant's theory of the case may or may not require proof of reliance. Panag v. Farmers Ins. Co. of Washington, 166 Wash.2d 27, 204 P.3d 885, 899-903 (2009). These cases strongly suggest that showing of reliance will be required to establish causation under the consumer protection acts of every state except California. The Court concludes that in these jurisdictions, as in New Mexico, causation will not be susceptible to class-wide proof.

(ii) Presumption of Reliance
Citing Berry v. Fed. Kemper Life Assur. Co., 136 N.M. 454, 474, 99 P.3d 1166 (Ct. App.2004), Porcell argues that the class should be afforded a presumption of reliance. [Doc. 104 at 22] The presumption discussed in Berry applies to omissions, not affirmative misrepresentations, and serves to relieve a plaintiff asserting misrepresentation-by-omission of the conceptually awkward burden of proving the he or she relied upon a statement that was not made. Berry, 136 N.M. at 474, 99 P.3d 1166. The presumption applies where "it is logical to believe that a reasonable person.. . would attach importance to the omitted fact in his choice of action on the transaction in question." The apparent breadth of the preceding statement is deceiving, because before a presumption of reliance on an omission can come into play, the defendant must have been under a duty to disclose the information to which the presumption attaches. See McElhannon v. Ford, 134 N.M. 124, 128, 73 P.3d 827 (Ct.App.2003) (discussing limitations on liability for non-disclosure). Thus, in order to decide whether to afford the class the benefit of a presumption of reliance, the Court must first decide whether Lincoln was under a duty to disclose the presence of breather tubes and their effect upon the life span of high altitude windows.
As the Court understands the current state of the law, in an arm's-length sales transaction a seller of merchantable, non-defective goods generally is under no duty to disclose to a buyer that some other product offers better value. Clearly, the availability of better products at the same price would be a material fact to a consumer; yet, no New Mexico authority suggests that a seller of goods is acting deceptively within the meaning of the NMUPA merely because the seller chooses to keep such information to itself. Although the Court agrees with Porcell that Lincoln would be acting deceptively by withholding the fact that its goods are defective, the Court disagrees with the premise that Lincoln's high altitude windows are defective if they do not provide the same longevity and performance as low altitude windows. A product is not defective merely because it is not perfect. 1 James J. White & Robert S. Summers, Uniform Commercial Code 673 (5th ed.2006). To be defective, Lincoln's high altitude windows would have to be so inferior in longevity and performance that they are unmerchantablei.e., not "fit for the ordinary purposes for which such goods are used." UCC § 2-314(2)(c); White & Summers, supra, at 669-70 (discussing relationship of the merchantability standard of UCC § 2-314 with the tort standard of § 402A of the Restatement (Second) Torts; concluding that with limited exceptions, the two standards are "interchangeable").
For substantially the same reasons that led the Court to conclude that class members' diminution-in-value damages are not subject to class-wide proof, the Court concludes that the existence of a duty to disclose is not subject to class-wide proof on the record now before the Court. First, as previously noted, Porcell's expert, Robin *1323 Booth, would not testify to the expected life of an typical insulated glass window. Thus, there is no baseline against which to measure the life span of class members' windows. Second, as the Court has previously observed, "the best case fairly supported by the record now before the Court is that high altitude windows have a shorter life span than low altitude windows, but exactly how much shorter will vary significantly from installation to installation." As Booth's own article suggests, a high altitude window might be defective and unmerchantable if installed in a hot and humid region, but provide satisfactory longevity and performance in many areas of the western United States. [Doc. 38-3 at 8-9] Indeed, Booth's article suggests that with additional desiccant, windows with breather tubes can achieve the same life spans as windows without breather tubes. [Doc. 38-3 at 8] Under the best case made out by Porcell, whether class members' windows are defective will vary from installation to installation. Accordingly, the questions of whether Lincoln was under a duty to disclose the presence of breather tubes and whether the buyer is entitled a presumption of reliance cannot be decided on a class-wide basis.

(iii) Low-E Subclass
Porcell claims that it was deceptive for Lincoln to fail to disclose that its high-altitude Low-E windows did not contain argon and did not have the same performance as low-altitude Low-E windows. The Court is persuaded that a typical consumer would be unlikely to have an expectation regarding argon gas and its superior insulating characteristics unless the consumer was first exposed to sales literature discussing the subject. A consumer who did not view Lincoln's Low-E advertising materials or who was not told about argon gas by a sales representative would most likely not have had an expectation one way or another with respect to argon gas and its incremental enhancement of the performance of Low-E windows.[7] Thus, the UPA claims of the Low-E subclass ultimately depend on proof of affirmative misrepresentations about the presence of argon gas or the performance characteristics of Low-E windows attributable to argon gas. Because there is no basis in the record for determining what information concerning the presence of argon gas or Low-E performance characteristics was provided to a particular Low-E subclass member, the non-disclosure claims of the Low-E subclass will not be susceptible to class-wide proof.

(iv) Statute of Limitations
The Court also concludes that individual questions of fact will predominate over common questions of fact with respect to Lincoln's statute of limitations defense. As previously noted, under New Mexico choice of law principles New Mexico will apply its own statute of limitations to foreign causes of action. The New Mexico Court of Appeals has held that the four-year statute of limitations of § 37-1-4 is the default statute of limitations for the NMUPA, which does not have its own statute of limitations. Nance v. L.J. Dolloff Assoc., Inc., 138 N.M. 851, 856, 126 P.3d 1215 (Ct.App.2005). As the highly fact dependant arguments set out in Plaintiff Bruce Porcell's Response to Defendant's Renewed Motion to Dismiss [Doc. 80] demonstrate, application of § 37-1-4 to a class member's NMUPA claim *1324 will present individualized questions of fact. [Id. at 20-22 (arguing for application of discovery rule); id. at 22-25 (arguing "successive injury" doctrine); id. at 25-28 (arguing for application of equitable estoppel); id. at 28 n. 11 (asserting that "whether or not Lincoln induced Porcell to refrain from filing suit involves a series of factual inquiries")]

f. Summary of Predominance Factors
Porcell's breach of warranty claim clearly involves a number of common, predominating questions of law. The problem that Porcell faces in seeking certification is that with limited exceptions these common legal standards generate individualized questions of fact. As noted above individual proof will predominate over class-wide proof with respect to damages for breach of the LWIG and "other" express warranties, UCC § 2-607(3)(a) notice, and application of the statute of limitations in UCC § 2-725. Further, individual will proof will be required to determine whether "other" warranties were created by Lincoln's advertising materials. In addition, the facially uniform standard of UCC § 2-313 has been varied by case law such that it is not a uniform standard across the nine jurisdictions in which class members reside.
Porcell's claim for breach of the unfair trade practices acts or consumer protection statutes of eight states is even more problematic. Porcell has provided the Court with a perfunctory analysis of the consumer protection statutes of the eight states that permit consumer class actions. [Doc. 104 at 37-38] Porcell has understated material differences in the eight states' laws rather than confronting the differences and providing the Court with a workable plan for managing these differences at trial. Lincoln has provided the court with a more detailed analysis which persuasively demonstrates numerous material differences among the eight states' consumer protections statutes. [Doc. 111-2 at 2-5]
Recently, the Honorable Robert C. Brack declined to certify a five-state class that included five of the states in the class proposed by Porcell based on his conclusion that
varying standards of liability would render the case difficult to manage, undermine Plaintiff's ability to fairly and adequately protect the interests of class members from other jurisdictions, and destroy any possibility of adjudicating putative class members' claims in accordance with a generalized standard of proof. Thus, the differing standards of liability under the five states' Consumer Protection/Consumer Fraud statutes would undermine the Rule 23 requirement of typicality, adequacy of representation, predominance, and superiority.
Woodard, 2008 WL 5737364 *5 (citations omitted). The addition of three more states in the present case substantially exacerbates the concerns noted in Woodard.
Further, apart from predominance concerns arising from the application of the laws of eight states, there will be a need for individualized fact finding with respect to the reliance-causation requirement under the varying standards of seven of the eight states. Applying § 37-10-4 will generate individual questions of fact with respect to those class members who purchased their windows prior to December 28, 2003. Calculating class member's actual damages will present problems similar to the problems noted with respect to damages for breach of warranty.
For the reasons set out above, the Court finds that Porcell has failed to establish that questions of law or fact common to class members will predominate over questions affecting only individual members.

*1325 2. Superiority
A condition to certification, Rule 23(b)(3) requires a finding "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." "Superiority is determined by comparing the efficiency and fairness of all available methods of adjudicating the matter. Under the superiority test of Rule 23(b)(3), a class action must be better than, and not merely as good as, other methods of adjudication." Moore's Federal Practice, supra, § 23.46[1].
Predominance and superiority are closely related: the number of individualized issues affects the manageability of a class action. Moore's Federal Practice, supra, § 23.46[2][e][I] at 23-280. As the Court has previously determined, this case will require application of the law of nine jurisdictions to the breach of warranty claims and the law of eight jurisdictions to the unfair trade practices acts/consumer protection statutes claims. The Court concludes that difficulty in applying the law of multiple states renders the single, multi-state class action proposed by Porcell less manageable than separate class actions brought in class members' home states where courts will be more familiar with the nuances of the home state's law. The Court's analysis of the NMUPA suggests that similar nuances in other states' law may present significant problems in making Erie predictions[8] about the application of the laws of nine states to the particular facts of this case. Further, the Court has determined that notwithstanding a number of common issues of law and fact, individual questions of fact will predominate over common issues. The predominance of individual questions of fact also weighs against a finding that a class action is a superior method of resolving class member's claims.
Porcell posits a typical class member who has purchased 20 windows. [Doc. 104 at 16] Assigning a conservative nominal purchase price of $300 per window results in a typical lawsuit worth $6,000, a non-trivial amount in controversy. In addition, the law of eight of the nine states in which class members reside allows individual plaintiffs to recover of attorney's fees in unfair and deceptive practices/consumer protection suits. Cal. Bus. & Prof.Code § 17802; Colo.Rev.Stat. § 6-1-113; Idaho Code § 48-608(5); Mont.Code Ann. § 30-14-906(2); Nev.Rev.Stat. § 41.600(3)(b); NMSA 1978, § 57-12-10(C); Or.Rev.Stat. Ann. § 646.638 (as amended by 2009 Or. Laws Ch. 327); Wash. Rev.Code § 19.86.090, while Arizona allows the recovery of attorney's fees is cases arising out of a contract, Ariz.Rev.Stat. § 12-341.01. The significant amount in controversy coupled with the availability of an award of attorney's fees suggests that individual lawsuits may be an effective method of obtaining relief. Castano v. Amer. Tobacco Co., 84 F.3d 734, 748 (5th Cir.1996) (noting availability of attorney's fees under consumer protection fee as a factor making individual suits cost effective). Individual lawsuits or state-by-state class actions have the further advantage of permitting class members to bring their lawsuits in a convenient forum. Further, Porcell has tailored his theory to support a class-wide theory of liability and damages. Consequently, he has relied on an untested theorybreather tubes as inherent defect that is heavily dependent on the testimony of a single expert witness whose opinions are largely derived from one laboratory experiment conducted in 1985. In view of the growing trend eliminating mutuality as an element of collateral estoppel, Wetzel v. Ariz. State Real Estate Dept., 151 Ariz. 330, 727 P.2d 825 (Ariz.Ct.App.1986); Vandenberg *1326 v. Superior Court, 21 Cal.4th 815, 88 Cal.Rptr.2d 366, 982 P.2d 229, 237 (1999); Antelope Co. v. Mobil Rocky Mt., Inc., 51 P.3d 995, 1003 (Colo.Ct.App.2001); Western Industrial and Environmental Services, Inc. v. Kaldveer Assoc., Inc., 126 Idaho 541, 887 P.2d 1048, 1052 (1994); Haines Pipeline Construction Inc. v. Montana Power Co., 265 Mont. 282, 876 P.2d 632 (1994); Five Star Capital Corp. v. Ruby, 194 P.3d 709, 713 (Nev.2008). Silva v. State, 106 N.M. 472, 476, 745 P.2d 380 (1987); Hanson v. Oregon Dept. of Rev., 294 Or. 23, 653 P.2d 964 (1982); State v. Mullin-Coston, 152 Wash.2d 107, 95 P.3d 321, 324 (2004), absent class members have a substantial interest in adopting a wait-and-see posture: if Porcell prevails in an individual suit absent class members may be able to piggy-back their claims on issues resolved in Porcell's favor; if Porcell loses, absent class members would not be bound and would benefit from lessons drawn from Porcell's case. The Court finds that Porcell has not established that the proposed class action is superior to individual actions or to state-by-state class actions brought after Porcell's individual claims have been tried.

CONCLUSION
The Court concludes that Porcell has satisfied the four requirements of Rule 23(a), but has failed to satisfy the predominance and superiority requirements of Rule 23(b)(3). Accordingly, the Motion for Class Certification [Doc. 104] is denied.
NOTES
[1] Citations to documents use the page numbers appearing at the top border of the pdf document, not the page numbers in the original documents]
[2] All references to the UCC are to Vols. 1A through 1C, Uniform Laws Annot. (2004).
[3] Ferrell was a multi-state contract action. 144 N.M. at 409, 188 P.3d 1156. It is not clear that the Supreme Court intended the Restatement (Second) Conflict of Laws to displace New Mexico's traditional choice of law rules in other contexts, such as multi-state tort class actions.
[4] Porcell argues that the lifetime post-1996 LWIG superceded the ten-year LWIG as to windows that were sold prior to the revision. [Doc. 121 at 15] Porcell cites no authority for the proposition that a revised written warranty provided later purchasers operates to retroactively modify the written warranty accompanying goods sold before the revised warranty even existed.
[5] "Capillary tubes" refer to narrow bore breather tubes. [Doc. 112 at 3]
[6] The Restatement (Second) Torts (1977) describes the plaintiff's showing as follows:

For a misrepresentation to be a cause in fact of the pecuniary loss that results from the plaintiff's action or inaction, the plaintiff must have relied upon the misrepresentation in incurring the loss. It is not, however, necessary that his reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct. It is not even necessary that he would not have acted or refrained from acting as he did unless he had relied on the misrepresentation. It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision. . . .
Section 546, cmt. b.
[7] The Low-E coating itself, rather than the argon fill, appears to be responsible for most of the enhanced performance of Low-E windows. [Doc. 116-3] A reasonable consumer advised that his windows would not contain argon gas could still have chosen to purchase high-altitude Low-E windows solely for the significant benefit afforded by the Low-E coating.
[8] Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).